## HERCULES CEMENT CORPORATION v. PENNSYLVANIA–DIXIE CEMENT CORPORATION.

### No. 946.

District Court, D. Delaware.
Jan. 24, 1936.

Hugh M. Morris, of Wilmington, Del., and Synnestvedt & Lechner, of Philadelphia, Pa., for plaintiff.

Richards, Layton & Finger, of Wilmington, Del., Hubert Howson, of New York City, and Dexter N. Shaw, of Philadelphia, Pa., for defendant.

NIELDS, District Judge.

This patent infringement suit is brought by Hercules Cement Corporation against Pennsylvania-Dixie Cement Corporation. Plaintiff is owner of patent No. 1,822,530 issued to Morris Kind assignor to plaintiff September 8, 1931, for "apparatus for handling cement or like material in bulk."

The sole defense is invalidity of the patent upon the ground that the invention of Kind was anticipated by others. More specifically, the defenses are "prior invention" and "prior knowledge and use"; "prior" meaning before August, 1928, the alleged date of Kind's invention. Defendant also relies upon the defense of "public use" for more than two years before June 14, 1930, when the application for the patent was filed.

Both plaintiff and defendant are engaged in the business of manufacturing Portland cement and of transporting it to points of delivery where concrete construction work is going on, such as a dam, bridge, building site, or road under construction. For many years cement was shipped in wooden barrels, cloth sacks, and paper bags. This method involved three handlings—unloading from cars, placing in storage, and transferring from storage house to place of delivery. About 1910 cement began to be used in large quantities and by 1919 a demand arose for its transportation in bulk. There was a substantial differential in favor of bulk shipments. The first bulk shipments were in box cars lined with fiber paper to prevent seepage and to exclude moisture. Unloading was done by shovels, scoops, and by pumps handled by men who could only work in short shifts because of the serious menace to life and health from the dust.

The patent in suit relates to a combination of equipment for transporting and unloading cement or like material in bulk.

In his specification the patentee states:

"This invention relates to apparatus for handling cement or similar materials in what is known as bulk condition and is particularly concerned with the provision of apparatus of this kind which can be utilized with railroad equipment.

"As it is well known, material such as cement is handled almost entirely in bags because of certain difficulties experienced in keeping the bulk material sufficiently dry or because of the large amount of dust created in handling, measuring or transporting the bulk material.

"By my improvements I am enabled to completely overcome the difficulties incident to the handling of cement or like material in bulk, as well as to greatly reduce the amount of time and money necessary in the handling of this commodity. In the accompanying specification and claims I will refer specifically to cement, but it is to be understood that my invention is applicable to the handling of other materials of similar character and that the term 'cement' is not necessarily to be limited to cement alone."

Claims 17, 18, 24, 25, 26, and 27 are in suit. Claim 17 is typical. It reads:

"17. Equipment for handling cement or like material in bulk comprising in combination, a railway car having a discharge hopper at each side, enclosed conveying mechanism below the car for receiving said

discharge, and extensible tubes for connecting the hoppers with said conveying mechanism."

The variations in the other five claims in suit add nothing of patentable novelty. All must stand or fall with claim 17.

The patented apparatus involves in combination three elements: (1) A railroad car having discharging hoppers at each side; (2) inclosed conveying mechanism or conveyors associated with the track at the point of railroad delivery for receiving and carrying away the discharge from the hoppers; and (3) flexible extensible canvas tubes or boots connecting the outlet of the hoppers to the conveyors.

Handling cement in bulk with the patented apparatus protects it from moisture and seepage and saves laborers from the evil effects of cement dust. This mechanical handling is illustrated when a hoppered car loaded with cement is brought to the point of delivery. Thereupon the boots are attached to the hoppers and the cement flows through the inclosed screw conveyors to a receiving receptacle or bin. As the load on the car lightens, the car springs lift the car body. The canvas boots being expansible, the connection is not broken. Thus there is a closed channel from the car to the point of ultimate discharge during the unloading. There are two conveyors in plaintiff's construction, one on each side of the car track extending longitudinally along the tracks. These conveyors have inlet openings corresponding in number to the number of hoppers. The material passes from the car through these two longitudinal conveyors and is delivered to a main conveyor extending crosswise of the tracks and ultimately is discharged into a bin or other receptacle.

In plaintiff's apparatus the walls of the hoppers slope at an angle of 56°, which is 1° more than the angle of repose of cement. Due to this angle, its cars are self-discharging to a considerable degree. Cars of cement usually travel about 200 miles from the place of manufacture to the point of destination. Due to the continual vibration of the car the cement packs. When the gates of the hoppers are opened, ordinarily, the cement will not commence to flow. A sledge hammer is used to tap the discharge throat of the hoppers and the flow begins. Sometimes the cement arches once or twice during the discharge and it is again necessary to tap the discharge throat. To induce the flow of the cement, plaintiff occasionally employs air jets and compressed air lances.

Defendant does not deny infringement if the patent is valid. Defendant answers the charge of infringement by averring that the combination of equipment patented by Kind was anticipated by others. Assuming that Kind's invention was in August, 1928, "public use" of this combination of equipment as well as "prior invention" and "prior knowledge and use" thereof are shown in two instances. The proof of anticipation is clear, detailed, and conclusive.

### Anticipation at Lima, Ohio.

In 1913, the Lima Locomotive Works at Lima, Ohio, used the combination of a hoppered car and screw conveyors for handling pulverized coal in bulk. Pulverized coal is like pulverized cement. The hopper angles now are and always have been as steep as those of plaintiff. The hopper outlets are as large as in plaintiff's car. Originally the car was without springs, but in 1918 it was provided with the conventional spring mountings. The closed form of conveyor was used for five years between 1913 and 1918. In the latter year the Lima Company opened the top of the conveyor for convenient "spotting" and allowed the lower end of the flexible hopper spout to hang down over the screw between the side walls of the conveyor. The workmen preferred the dust to the bother of spotting the car in the way they had been previously doing it for five years.

Here was a complete anticipation and public use of the combination of the three elements which constitute the invention of the claims of the patent in suit. Plaintiff's criticism of this anticipation is of no weight. The transverse arrangement of the conveyor was used at Lima in the first instance and in any event is a mere matter of location common in the art. Securing the flexible boot at its bottom as well as at its top is not an inventive act but the work of a mechanic as occasion may require.

### Anticipation at Alcoa, Tenn.

The prior invention, prior knowledge and use, and two years' public use at Alcoa, Tenn., have been proved by the testimony of a dozen witnesses with 90 exhibits. This evidence shows the evolution of hopper-bottomed cars used in combination with flexible tubes to be connected to the outlets of the hoppers of the cars and also to

be connected to openings in an inclosed screw conveyor mounted transversely to the railway track and between the ties of the railroad. These three elements were combined and operated in the way defined in the patent and respond in every respect to the claims in suit.

· Before 1926 the Alcoa Ore Company shipped granular alumina in bulk in box cars lined with tarpaulin from East St. Louis, Ill., to the reduction plant at Alcoa, Tenn. In unloading it · was necessary for men to enter the cars and shovel the alumina into a vertical elevator. There were two evil results from this mode of handling the material. Workmen were harmed by the dust. The alumina which must be kept dry for metallurgical treatment, was contaminated by moisture and dirt. Kind says the difficulties to be remedied by his patent were "certain difficulties experienced in keeping the bulk material dry or because of the large amount of dust created in handling." These were difficulties · experienced at Alcoa, long before the patent.

. November 28, 1925, the traffic manager of the Aluminum Company of America at Pittsburgh wrote the various plants suggesting the use of hopper bottomed cars in the transportation of alumina. The matter was discussed between the officers and engineers at Pittsburgh, East St. Louis, and Alcoa. In the spring of 1926, a drawing was produced showing the complete combination of hopper car, transverse closed screw conveyor, and flexible boot connected at the top to the mouth of the hopper and at the bottom to the opening in the conveyor. Thereupon three hopper cars were ordered to be equipped according to the drawing. A screw conveyor was installed at Alcoa. In the fall of 1926 the three cars transported alumina to Alcoa, but were found not as self-emptying as desired. October 18, 1926, the engineer recommended that the angles of the hoppers be increased from 30° to 45°. These three cars of the Alcoa Company transported nearly 6,000,000 pounds of alumina in 1926 and 1927.

October 7, 1927, the company records state: "We are proceeding now to design 45° hoppers throughout, including the center hoppers, for three of our old bad order cars, and will install these hoppers as soon as possible." The drawing for this new design dated October 25, 1927, is in evidence showing all the slopes of each hopper at 45° except one slope with an angle of 67°.

January 24, 1928, the first of these three cars was put into regular use and has remained in use ever since. There was "public use" of this car in regular commercial business more than two years before the application for the patent in suit was filed on June 14, 1930.

The other three cars were completed in June and July, 1928. Subsequently 20 more cars of the same construction were built and put into service. The Alcoa Company now has a fleet of 24 of these hoppered cars for use in connection with closed screw ·conveyors and flexible boots connecting the hopper discharges with the openings in the conveyors. The Alcoa Company solved the "difficulties" before Kind had thought of them.

█ In answer to this conclusive proof of anticipation at Alcoa, plaintiff raises two objections: (1) That the angle of slope of the hoppers in the Alcoa cars of 45° is too low for cement; (2) that the 6-inch outlets of the hoppers in the Alcoa cars· is too small for handling cement. These objections are untenable. The Kind patent does not mention either in the specification or claims the angle of slope of the hoppers or the size of the outlets. A patentee cannot base a claim of invention upon something which is nowhere stated in his written description or claims, even though it may be shown in the drawing of his patent. Permutit Co. v. Graver Corporation, 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163.

Plaintiff further suggests that the word "gravitate" in the patent excuses the lack of particular specification of the angle. That is clearly unsound. It leaves to the mechanic ascertainment of the best angle for his purpose. The experience at Alcoa shows that if a granular material does not flow at a given angle, the obvious thing is for the man skilled in the art to increase the angle.

It is immaterial whether the Alcoa apparatus was less efficient for handling cement than the apparatus of plaintiff. The · Alcoa car embodied the same elements combined for the same purpose in the same way and operated to produce the same result as the apparatus of the patent in suit. The claims in suit were fully anticipated.

This opinion contains a statement of the essential facts and of the. law applicable thereto in conformity with Equity Rule 70½, 28 U.S.C.A. following section 723.

The bill of complaint must be dismissed.